UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

ANDREW SHIFFMAN, individually and on        Docket No. 26-cv-4879
behalf of all others similarly situated,

                Plaintiff,        **COLLECTIVE AND CLASS
                                         ACTION COMPLAINT**

        -against-

STRAIGHT LINE SOURCE, INC., ALI MAYAR
AND MICHAEL HACKER, VINCENT BARCLONG,
OWNER, LOUIS MAZZELLA, OWNER,

                Defendants.

----------------------------------------------------------X

## NATURE OF ACTION

1. Plaintiff Andrew Shiffman brings this collective and class action against Straight Line Source, Inc., Ali Mayar, and Michael Hacker to recover unpaid minimum wages, overtime compensation, earned commissions, and unlawful deductions, and to obtain relief for retaliation and wage-notice and wage-statement violations under the Fair Labor Standards Act, the New York Labor Law, and New York common law.

## JURISDICTION AND VENUE

2. This Court has subject-matter jurisdiction over Plaintiff's claims arising under the Fair Labor Standards Act pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

3. This Court has supplemental jurisdiction over Plaintiff's New York statutory and common-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal claims.

4. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside and

transact business in this District, Straight Line Source, Inc. maintains its principal office in Nassau County, and a substantial part of the events and omissions giving rise to these claims occurred in this District.

## PARTIES AND PROPERTY

5. Plaintiff Andrew Shiffman is an individual who resides in Nassau County, New York, and who worked for Defendants as a commission salesperson.

6. Defendant Straight Line Source, Inc. ("Straight Line") is, upon information and belief, a New York corporation with its principal office at 215 RXR Plaza, Uniondale, New York, in Nassau County.

7. Defendant Ali Mayar is an individual who exercised operational control over Straight Line and over Plaintiff's employment, work schedule, compensation, commission payments, payroll records, and continued employment.

8. Defendant Michael Hacker is an individual who exercised operational control over Straight Line and over Plaintiff's employment, work schedule, compensation, commission payments, payroll records, and continued employment.

9. Mayar and Hacker acted directly and indirectly in Straight Line's interest in relation to Plaintiff and the similarly situated sales representatives and were Plaintiff's employers jointly with Straight Line.

## FACTUAL ALLEGATIONS

10. Straight Line sells working-capital products and business loans to medium- and high-risk borrowers.

11. Straight Line works with banks and other lenders that pay Straight Line compensation, points, and fees when transactions fund.

12. Straight Line employs sales representatives who solicit borrowers and originate transactions, and it compensates those representatives through commissions tied to the compensation Straight Line receives from lenders.

13. Straight Line hired Plaintiff in or around November 5, 2024, as a commission salesperson.

14. Defendants did not provide Plaintiff with a written commission agreement.

15. Defendants did not provide Plaintiff with a notice of pay rate at hiring or thereafter that accurately stated the basis of his compensation.

16. Although these were times Defendants deviated from the commission schedule, the parties compensation agreement required Defendants to pay Plaintiff 20% of all compensation Straight Line received on new business originated by Plaintiff and 15% of all compensation Straight Line received on renewals of that business.

17. Defendants exclusively controlled the lender contracts, lender invoices, commission sheets, clawback records, payroll records, and records showing the points, fees, and other compensation Straight Line received.

18. Plaintiff lacked access to the complete information necessary to calculate and verify his commissions.

19. Plaintiff originated a transaction known as the Simad or CAMP deal in or about December 29, 2024.

20. Plaintiff brought in this client by cold-calling CAMP's owner, Michael Shabsells.

21. Defendants did not disclose what Straight Line received on the CAMP deal and did not pay Plaintiff his full 20% commission on that compensation.

22. CAMP's first funding was a $3.85 million loan through NEWCO.

23.    Straight Line received four points, or $154,000, on that transaction.

24.    Under the agreed 20% formula, Plaintiff earned a commission of $30,800, which Defendants initially paid.

25.    Defendants later required Plaintiff to repay $27,800 of that earned commission as a purported clawback, claiming that the loan had been repaid early.

26.    Defendants never provided evidence substantiating the purported early repayment or the asserted contractual basis for the clawback.

27.    Plaintiff requested the governing lender contract, but Defendants and Hacker refused to produce it.

28.    Defendants nevertheless held Plaintiff up within the company as an example of how other salespeople could make money through aggressive cold calling.

29.    In or around late 2025 through early 2026, Defendants imposed a new schedule requiring Plaintiff to work in the office from 7:30 a.m. until 7:00 p.m.

30.    Defendants also required Plaintiff to attend sales meetings two or three times each week.

31.    Plaintiff regularly worked more than 40 hours in a workweek under Defendants' direction and control.

32.    Plaintiff's primary duties consisted of in-office sales work, including telephone solicitation and related activities, and he did not customarily and regularly perform his primary duties away from Defendants' place of business.

33.    Plaintiff was paid only commissions and received no hourly wages or separately calculated overtime premium for hours worked over 40.

34.    In workweeks when Plaintiff did not earn commissions or Defendants withheld, reduced, delayed, or clawed back commissions, Plaintiff's compensation divided by his hours worked fell below the applicable minimum wage.

4

35.    Upon information and belief, Defendants may have properly paid Plaintiff on some CAMP related commissions involving lenders including NEWCO, IOU, Credibly, Channel Partners, and Cash Floit.

36.    Even for those transactions, however, Defendants withheld the underlying records Plaintiff needed to verify the compensation received and the commissions paid.

37.    Beginning in July 2025, Defendants increasingly departed from the agreed commission formula and actively concealed the amounts Straight Line received.

38.    For example, in or around 2025, on a $5 million CAMP loan, Straight Line received 13 points.

39.    If Defendant received 13 points, Plaintiff's 20% commission on that transaction should have been $78,000.

40.    Instead, Defendants paid Plaintiff only $4,500.

41.    Defendants falsely told Plaintiff that Straight Line had received only one point, even though contracts Plaintiff saw confirmed that Straight Line received 13 points.

42.    When Plaintiff complained about his compensation and sought truthful supporting records, Mayar and Hacker called him a "cheap jew" and a "clown" and mocked Plaintiff for wearing a yarmulke in the office.

43.    The slur evidenced Defendants' retaliatory animus and bad faith in responding to Plaintiff's wage complaints.

44.    Mayar and Hacker showed Plaintiff a false invoice to conceal the compensation Straight Line actually received.

45.    In or about June 2025, CAMP later obtained a $5 million loan from Mulligan.

46. Mulligan paid Straight Line about 10-13 points, or a minimum of $500,000, on that transaction.

47. Defendants represented to Plaintiff that the transaction was a one-point deal.

48. Because the transaction was a renewal, Plaintiff should have earned 15% of at least $500,000, or $75,000, but Defendants paid him only $7,500.

49. In January 2026, CAMP obtained another loan from Mulligan in the amount of $15 million.

50. Mulligan paid Straight Line 10 points, or $1.5 million, on that renewal.

51. Under the agreed 15% renewal formula, Plaintiff should have earned $225,000 on that transaction.

52. Defendants forced Plaintiff to sign a document subtracting one point from his commission and falsely told him that the transaction paid two points rather than 10 points.

53. Defendants paid Plaintiff only $27,500 on that transaction.

54. CAMP also obtained another $10 million loan through NEWCO that paid Straight Line six points, or $600,000.

55. That transaction was a CAMP renewal, and Plaintiff therefore earned a 15% commission of $90,000.

56. Defendants paid Plaintiff only $15,000 and told him that he had lost one point because he arrived at 9:00 a.m. instead of 7:30 a.m.

57. Defendants threatened to take away all of Plaintiff's commissions if he continued to complain.

58. Plaintiff repeatedly demanded the lender contracts and additional information needed to verify his commissions and challenge the underpayments and deductions.

59. In or around March 25, 2026, Defendants terminated Plaintiff without notice.

60. Defendants asserted that Plaintiff was terminated for a lack of new business, although Plaintiff then had approximately $1.1 million in other loans in his pipeline.

61. The timing, threatened forfeiture of commissions, hostile response to Plaintiff's wage complaints, false records, and pretextual explanation connect Plaintiff's termination to his repeated demands for earned wages and supporting records.

62. Defendants did not provide Plaintiff with accurate wage statements or pay stubs showing his hours, rates of pay, gross wages, commissions, deductions, and net wages.

63. Any wage statements Defendants provided failed to accurately show Plaintiff's hours, regular and overtime rates, commissions earned and paid, lender compensation used to calculate commissions, or the timing and basis of deductions and clawbacks.

64. The absence of a pay-rate notice and accurate wage statements deprived Plaintiff of information necessary to understand and verify his regular and overtime rates and to determine whether Defendants were applying the agreed 20% and 15% commission formulas.

65. The missing and inaccurate records prevented Plaintiff from timely detecting the basis and timing of clawbacks and deductions and from comparing amounts received from lenders against commissions paid.

66. Those record keeping failures delayed Plaintiff's discovery of the underpayments and forced him to work and continue his employment without knowing the true basis of his compensation.

67. Defendants' concealment caused Plaintiff concrete informational and economic harm by impeding his ability to monitor wages, commissions, and deductions, promptly challenge underpayments, and vindicate his rights before termination.

68. Defendants employed more than forty other salespeople who were subject to common compensation, scheduling, recordkeeping, and payroll practices.

69. The other salespeople performed substantially similar in-office sales duties, were paid commissions, were required to work straight-time and overtime hours, and were not paid lawful wages for all hours worked.

70. Defendants used common practices to understate lender-paid points and fees, miscalculate commissions, impose unsupported clawbacks or deductions, and withhold the records needed to verify compensation.

71. Plaintiff brings the FLSA wage claims for himself and all current and former commission sales representatives employed by Defendants during the applicable limitations period who worked more than 40 hours in a workweek or received less than the federal minimum wage and were not paid the compensation required by the FLSA.

72. Plaintiff and the putative FLSA collective members are similarly situated because they performed similar sales work and were subject to common policies concerning schedules, commissions, overtime, minimum wages, deductions, and payroll records.

73. Plaintiff brings the New York claims under Federal Rule of Civil Procedure 23 on behalf of all current and former commission sales representatives employed by Defendants in New York during the applicable limitations period and subjected to Defendants' common unlawful wage, commission, deduction, notice, statement, and retaliation-related practices.

8

74. The proposed New York class is sufficiently numerous that joinder is impracticable because Defendants employed more than a dozen affected salespeople and their identities and employment records are within Defendants' exclusive control.

75. Common questions include whether Defendants were joint employers, whether the sales representatives were non-exempt, whether Defendants failed to pay minimum and overtime wages, whether commissions were systematically understated, whether deductions and clawbacks were authorized, and whether required wage notices and statements were furnished accurately.

76. Plaintiff's claims are typical because they arise from the same compensation, scheduling, disclosure, deduction, and recordkeeping practices applied to the proposed class.

77. Plaintiff will fairly and adequately protect the interests of the proposed class, and no conflict exists between Plaintiff and the proposed class.

78. The common questions predominate over individualized issues because liability turns principally on Defendants' uniform policies and records, and a class action is superior to separate actions involving comparatively small wage claims and common proof.

79. Defendants' exclusive control over lender contracts, invoices, commission sheets, clawback records, and payroll records prevents Plaintiff from determining every deal he placed, the full compensation Defendants received, and the total compensation withheld.

80. An accounting is necessary, in the alternative, to identify Plaintiff's transactions, trace lender-paid compensation, apply the agreed commission percentages, and determine all wages and commissions due.

## COUNT I

### FAILURE TO PAY MINIMUM WAGES AND OVERTIME
### (FAIR LABOR STANDARDS ACT, 29 U.S.C. §§ 206, 207, AND 216(b))

81.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

82.    Plaintiff asserts this claim against all Defendants on behalf of himself and the similarly situated FLSA collective members.

83.    Defendants were employers, and Plaintiff and the collective members were employees engaged in commerce or in the production of goods for commerce within the meaning of the FLSA.

84.    Plaintiff and the collective members were non-exempt employees entitled to the federal minimum wage for every hour worked and overtime compensation at one and one-half times their regular rates for hours worked over 40 in a workweek.

85.    Defendants required Plaintiff and the collective members to work lengthy in-office schedules and attend meetings but paid them only commissions, without ensuring payment of the minimum wage or paying a separately calculated overtime premium.

86.    Defendants' withholding, reduction, delay, and clawback of commissions caused Plaintiff and collective members to receive less than the federal minimum wage in affected workweeks.

87.    Defendants knew the employees' schedules and controlled the commission and payroll records, and their failures to pay lawful minimum wages and overtime were willful.

88.    Plaintiff and the collective members are entitled to unpaid minimum wages and overtime compensation, an equal amount as liquidated damages, prejudgment interest to the extent permitted, attorney's fees, and costs.

## COUNT II

## UNPAID MINIMUM WAGES, OVERTIME, EARNED COMMISSIONS AND UNLAWFUL DEDUCTIONS
### (NEW YORK LABOR LAW)

89. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

90. Plaintiff asserts this claim against all Defendants individually and on behalf of the proposed New York class under New York Labor Law Articles 6 and 19.

91. Plaintiff and the class members were non-exempt employees entitled to the New York minimum wage for every hour worked and overtime compensation at one and one-half times their regular rates for hours worked over 40 in a workweek.

92. Defendants failed to pay those wages by requiring straight-time and overtime work while paying commissions alone and by failing to ensure the applicable minimum and overtime compensation.

93. Plaintiff's commissions became earned wages when the transactions he originated funded and Straight Line received lender-paid compensation under the agreed 20% new-business and 15% renewal formulas.

94. Defendants unlawfully withheld earned commissions by understating lender compensation, applying false commission rates, and paying only fractions of the commissions due on the Simad and CAMP transactions.

95. Defendants also made unauthorized deductions and clawbacks from earned wages, including the $27,800 clawback and reductions purportedly based on early repayment, arrival time, and fabricated point calculations.

96. Defendants did not obtain lawful written authorizations for those deductions, and the deductions were not for Plaintiff's benefit.

97. Defendants' violations were knowing and willful and caused Plaintiff and the class members substantial unpaid wages and economic loss.

98. Plaintiff and the class members are entitled to unpaid minimum wages, overtime compensation, earned commissions, recovery of unlawful deductions, liquidated damages, prejudgment interest, attorney's fees, and costs.

## COUNT III

## BREACH OF CONTRACT

99. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

100. Plaintiff and Defendants entered an enforceable agreement under which Plaintiff would originate business and Defendants would pay him 20% of all compensation Straight Line received on new business and 15% on renewals.

101. Plaintiff performed by originating the Simad transaction, the CAMP relationship, and the CAMP-related transactions described above.

102. Defendants received substantial lender-paid compensation from the business Plaintiff originated.

103. Defendants breached the agreement by concealing lender compensation, misrepresenting points and fees, applying unauthorized reductions, and failing to pay the agreed percentages.

104. The unpaid amounts include, without limitation, the shortfalls on the Simad deal, the $3 million transaction, the $5 million Mulligan renewal, the $15 million Mulligan renewal, the $10 million NEWCO renewal, and the improper $27,800 clawback.

105. Plaintiff suffered direct damages in an amount to be determined through Defendants' records and an accounting, but already known to total hundreds of thousands of dollars on identified transactions alone.

## COUNT IV

### UNJUST ENRICHMENT AND QUANTUM MERUIT (IN THE ALTERNATIVE)

106.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

107.    Plaintiff pleads this claim in the alternative to his contract claim to the extent the existence, scope, or enforceability of the oral compensation agreement is disputed.

108.    Plaintiff performed valuable services by identifying, soliciting, developing, and maintaining clients and by originating transactions that generated substantial lender-paid compensation for Defendants.

109.    Defendants accepted and benefited from Plaintiff's services with knowledge that Plaintiff expected compensation based on the value of the transactions and the promised commission percentages.

110.    Defendants retained the economic benefit of Plaintiff's work while withholding a substantial portion of the compensation attributable to that work.

111.    It would be inequitable and unjust for Defendants to retain the withheld compensation without paying Plaintiff the reasonable value of his services.

112.    Plaintiff is entitled to restitution and the reasonable value of his services, measured by the agreed commission formula or such other amount as the evidence establishes.

## COUNT V

### RETALIATION
### (FAIR LABOR STANDARDS ACT AND NEW YORK LABOR LAW)

113.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

114.    Plaintiff repeatedly complained to Mayar, Hacker, and Straight Line that Defendants were withholding earned commissions, making unsupported deductions, and refusing to disclose records needed to verify his wages.

115. Plaintiff's complaints and demands asserted rights protected by the FLSA and the New York Labor Law and put Defendants on notice that he believed their wage practices were unlawful.

116. Defendants responded with threats to take away all commissions, hostile and antisemitic abuse, false invoices, continued concealment of compensation records, and increasingly severe underpayments.

117. Defendants terminated Plaintiff in April 2026 after he repeatedly demanded lender contracts and accurate information concerning his commissions and wages.

118. Defendants' asserted reason for termination was pretextual because Plaintiff had approximately $1.1 million in other loans in his pipeline.

119. Plaintiff's protected complaints were a motivating and but-for cause of the threats, compensation deprivations, and termination.

120. Defendants' retaliation caused Plaintiff lost wages, lost commissions, emotional distress, and other compensable harm.

121. Plaintiff is entitled to all legal and equitable relief authorized by the FLSA and the New York Labor Law, including lost compensation, liquidated damages where available, compensatory damages, reinstatement or front pay, attorney's fees, and costs.

## COUNT VI

### FAILURE TO PROVIDE WAGE NOTICE AND ACCURATE WAGE STATEMENTS (NEW YORK LABOR LAW §§ 195(1), 195(3), AND 198)

122. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

123. Defendants failed to provide Plaintiff at hiring with a compliant notice accurately stating his rates and basis of pay, including the agreed commission formula, regular rate, overtime rate, allowances, and other information required by law.

14

124. Defendants failed to furnish accurate wage statements for each pay period showing dates of work, hours worked, regular and overtime rates, gross wages, commissions, deductions, clawbacks, and net wages.

125. Any statements provided were materially inaccurate because they did not disclose the lender compensation used to calculate commissions, the agreed 20% and 15% formulas, the true commission amounts earned, or the timing and basis of deductions.

126. These omissions deprived Plaintiff of information necessary to verify his compensation, identify underpayments, compare lender receipts with commissions paid, and promptly challenge unauthorized clawbacks and deductions.

127. The missing and inaccurate records delayed Plaintiff's discovery of Defendants' wage theft, caused him to continue working without knowing the true basis of his pay, and materially impeded his ability to vindicate his rights before termination.

128. Plaintiff suffered concrete informational and economic injury and is entitled to statutory damages, costs, attorney's fees, and other relief authorized by New York Labor Law § 198.

129. Because Defendants exclusively possess the lender contracts, invoices, commission sheets, clawback records, and payroll records necessary to establish the full amount due, Plaintiff alternatively seeks an equitable accounting of all transactions he originated and all related compensation received and withheld.

**PRAYER FOR RELIEF**

130. WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and in favor of the FLSA collective and Rule 23 class, and grant the following relief:

   a. Certify this action as a collective action under 29 U.S.C. § 216(b), authorize notice to similarly situated employees, and permit them to opt in;

15

b.      Certify the proposed New York class under Federal Rule of Civil Procedure 23, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

c.      Declare that Defendants violated the FLSA and the New York Labor Law;

d.      Award Plaintiff, the collective members, and the class members all unpaid minimum wages, overtime compensation, earned commissions, and amounts unlawfully deducted or clawed back;

e.      Award damages for breach of contract or, in the alternative, restitution and the reasonable value of Plaintiff's services under unjust-enrichment and quantum-meruit principles;

f.      Order an accounting requiring Defendants to identify every transaction Plaintiff originated, produce the lender contracts, invoices, commission sheets, clawback records, and payroll records, disclose all compensation received, and calculate all compensation withheld under the agreed commission formulas;

g.      Award liquidated damages under the FLSA and New York Labor Law to the fullest extent permitted;

h.      Award statutory damages for wage-notice and wage-statement violations;

I.      Award all relief available for retaliation, including back pay, lost commissions, front pay or reinstatement as appropriate, compensatory damages, liquidated damages where authorized, and equitable relief;

j.      Award prejudgment and post-judgment interest as permitted by law;

k.      Award reasonable attorney's fees, costs, and expenses; and

16

l.      Grant such other and further legal or equitable relief as the Court deems just and proper.

## CERTIFICATE OF SERVICE

I certify that, following issuance of summonses, the Complaint and summonses will be served on Defendants in accordance with Federal Rule of Civil Procedure 4, and that subsequent papers will be served through the Court's CM/ECF system on registered users or by another method authorized by the Federal Rules of Civil Procedure. Fed. R. Civ. P. 4.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated:  August 10, 2026
        Garden City, New York

Respectfully submitted,

LAW OFFICES OF JASON L. ABELOVE, P.C.

By: _____
      Jason L. Abelove
      *Attorneys for Plaintiff*
      666 Old Country Road, Suite 303
      Garden City, NY 11530
      516-222-7000
      Jason@jasonabelove.com